UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JANBAZ KHAN,

              Plaintiff,                    Index No.:

        -against-

THE CITY OF NEW YORK, OFFICER TIMOTHY      **VERIFIED**
TROTTER (N.Y.P.D.) SHIELD #18501, OFFICER      **COMPLAINT**
FRANK DANOY (N.Y.P.D.) SHIELD #20242,
OFFICERS JOHN DOE #1-10 (THE NAME JOHN    **JURY TRIAL**
DOE BEING FICTITIOUS, AS THE TRUE NAME(S)   **DEMANDED**
IS/ARE PRESENTLY UNKNOWN),

              Defendant.
-------------------------------------------------------------------X

      The Plaintiff, complaining by his attorney(s), THE LAW OFFICE OF ANDREW L.

HOFFMAN, P.C., respectfully shows this Court and alleges:

## INTRODUCTION

1. This is a civil rights action to vindicate the wrongful arrest and prosecution of Plaintiff

   Janbaz Khan, a 57-year-old Pakistani-born citizen of the United States, husband, father of

   seven, and successful businessman with no prior criminal or arrest record.

2. On January 21, 2016, Mr. Khan was arrested amidst false allegations from a New York

   City transit officer that he had been stalking a woman on a subway platform, before

   boarding a train behind her, and pushing his groin against her buttocks.

3. Mr. Khan, who maintained his innocence throughout, was acquitted in a bench trial, after

   the Government failed to produce surveillance footage to corroborate the allegations,

   failed to explain how material portions of the arresting officer's story were contradicted

1

by both Mr. Khan and the alleged victim, and failed to account for the fact that verified

train schedules were in direct conflict with the lead officer's narrative.

4. While every victim of sexual misconduct must be heard and protected, in the case of Mr.

Khan, overzealous, racially tinged[1], numbers-driven policing led the officers involved to

see sex crimes in shadows, supported only by blind ambition and manufactured evidence.

5. It is notable that in 2016, the year of Mr. Khan's arrest, the New York City Police

Department ("NYPD") embarked upon a highly publicized[2] campaign aimed at

eradicating subway sex crime.  Reportedly, as of June of 2016, there was a nearly 57%

increase in recorded sex crimes from the previous year.

6. According to NYPD Transit Chief Joseph Fox, "[M]ost arrests for these crimes come

from officer-initiated enforcement—where [] plain clothes officers observe elements of a

crime and intervene…".  Fox also attributed the increase to the NYPD's "doubling down"

on efforts to encourage reporting.

7. This is significant to Mr. Khan, because "officer-initiated enforcement" in his case

manifested in a plain clothes police officer running after the alleged victim ("T.G.") when

she got off the train, abruptly stopping her, and in her words, "scaring" her.

8. The officer opined that he had witnessed another subway rider behaving in a sexually

abusive way toward her and insisted that she provide a written statement about it in his

---

[1] See Crime and Enforcement Activity in New York City (Jan 1 – Dec 31, 2016), (approximately 80% of misdemeanor sex crime arrestees in 2016 were people of color), available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/year-end-2016-enforcement-report.pdf.

[2] See, e.g., Chief of Transit Joseph Fox's Statement Before MTA NYCT Committee, NYPD News, June 20, 2016, available at http://nypdnews.com/2016/06/chief-of-transit-joseph-foxs-statement-before-mta-nyct-committee/; Subway Sex Crimes Soar ans More Victims Come Forward, NYPD Transit Chief Says, NY 1, June 21, 2016, available at http://www.ny1.com/nyc/all-boroughs/transit/2016/06/20/subway-sex-crime-stats-soar-as-more-victims-come-forward--nypd-transit-chief-says.html; NYPD Report Reveals Horrifying Spike in Subway Sex Crimes Over the Last Three Years, New York Daily News, June 6, 2017, available at http://www.nydailynews.com/news/politics/subway-sex-crimes-spike-3-years-nypd-report-shows-article-1.3226788.

memo book.  T.G. did her best to comply with the officer's directive, writing that the train had been crowded, and a man behind her was "pressing up against" her, and seemed "inappropriately close."

9. Contrary to the officer's depiction, however, there was nothing about being stalked by Mr. Khan prior to boarding the train, and nothing about Mr. Khan pressing his groin into her buttocks.  At trial, T.G. could not even identify Mr. Khan in Court.

10. Defendant Officers Trotter, Danoy, and Doe(s) are now being sued for fabricating evidence, and wrongfully arresting and prosecuting Mr. Khan.

11. The City of New York is being sued for failing to properly train, supervise, and/or discipline New York City police officers, and for continuing to tolerate and defend a widely publicized, departmental culture of willful indifference toward the rights of citizens.

## **JURISDICTION**

12. Jurisdiction is founded upon the existence of a Federal Question.

13. This is an action to redress the deprivation under color of statute, ordinance, regulation, custom, or usage of rights, privileges, and immunities secured to the Plaintiff by the First, Fourth and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. Sections 1983 and 1988, and arising under the law and statutes of the State of New York.

14. Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343(3) and 1343(4), this being an action authorized by law to redress the deprivation under the color of law, statute, ordinance, regulation, custom and usage of rights, privileges and immunities secured to

3

Plaintiff by the First, Fourth and Fourteenth Amendments to the Constitution of the United States.

## VENUE

15. Venue lies in this District pursuant to 28 U.S.C.A. Section 1391(b) (2) since the events giving rise to the claim occurred in the Southern District.

## PARTIES

16. At all times relevant and hereinafter, Plaintiff Janbaz Khan was a resident of Chatham, New Jersey.

17. Prior to the incident set forth in the instant Complaint, Mr. Khan, who was 55 years old on the date of the incident, had never been arrested and had no criminal history of any kind.

18. Upon information and belief, at all times hereinafter mentioned, the Defendant, CITY OF NEW YORK was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, and that at all times relevant all Defendant officers were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

19. Upon information and belief, at all times hereinafter mentioned, the Defendant, CITY OF NEW YORK, its agents, servants, and employees, operated, maintained and controlled the NEW YORK CITY POLICE DEPARTMENT, including all the police officers thereof.

20. Upon information and belief, at all times hereinafter mentioned, Defendant POLICE OFFICERS TROTTER, DANOY, and POLICE OFFICER(S) DOE #1-10[3] were employed by the Defendant, CITY OF NEW YORK, as members of its police department.

21. Upon information and belief, at all times hereinafter mentioned, all Defendant Police Officers, be they known or unknown, worked for the Transit Borough Manhattan Task Force, in the City of New York.

22. The NEW YORK CITY POLICE DEPARTMENT is a local governmental agency, duly formed and operating under and by virtue of the Laws and Constitution of the State of New York and the POLICE CHIEF THE NEW YORK CITY POLICE DEPARTMENT is responsible for the policies, practices, and customs of the NEW YORK CITY POLICE DEPARTMENT as well as the hiring, screening, training, supervising, controlling and disciplining of its police officers and civilian employees, and is the final decision maker for that agency.

23. This action arises under the United States Constitution, particularly under provisions of the First, Fourth and Fourteenth Amendments of the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, and the rights guaranteed by the Constitution and laws of the State of New York.

24. Individual Defendants in this action are being sued in both their individual and official capacities.

---

[3] Plaintiff's diligent search for the identity of all N.Y.P.D. officers involved remains ongoing.  Accordingly, the Corporation Counsel is on notice that the plaintiff intends to name every officer involved as a defendant once their identities are revealed through discovery.  All appropriate steps to prepare the officers' defenses and otherwise inform them that they will be individually named should be undertaken forthwith.

### STATEMENT OF FACTS

### -Mr. Khan's Story-

25. On Thursday, January 21, 2016, Plaintiff Janbaz Khan took a train that departed at about 5:15PM from his home station in Chatham, New Jersey, destined for Pennsylvania Station in Manhattan, New York.  Mr. Khan's son had dropped him off at the station at approximately 5:00PM.

26. Mr. Khan was coming into the City to meet up with his brother near 43rd Street and Third Avenue, before proceeding down to an art exhibition, featuring the work of a family friend, at a gallery on 18th Street, between Sixth and Seventh Avenue.

27. Mr. Khan's train arrived at Penn Station at approximately 6:15PM.  From there, he purchased a Metro card and headed to the uptown 2/3 platform, arriving at about 6:25PM.

28. Mr. Khan waited at the same location on the crowded platform for approximately two minutes before boarding the first (equally crowded) train that arrived, entering the second car from the front.

29. The uptown rush hour train was slow moving, taking approximately seven or eight minutes to arrive at the next station, which was Times Square.

30. The trip itself was uneventful; Mr. Khan remained in the same position, holding onto a pole for balance, for the duration of the trip.

31. At no time did Mr. Khan press his body into anyone or make anything other than incidental contact with any of his fellow passengers.

32. When Mr. Khan arrived at Times Square, he exited the train and began heading toward the S train, intending to catch it to Grand Central, near where he was scheduled to meet his brother.

33. Suddenly, Mr. Khan heard someone yelling, "Stop!  Stop!"  Mr. Khan turned and realized the command was being directed at him.

34. Upon information and belief, the person yelling for Mr. Khan to stop was Defendant Officer Danoy; Danoy proceeded to handcuff Mr. Khan, alleging that he had sexually abused a fellow train passenger.

35. A shocked, confused, and terrified Mr. Khan was then imprisoned overnight, until his arraignment on January 22, 2016.  He was then released on his own recognizance, after being charged with two counts of Forcible Touching (an A Misdemeanor) and one count of Sexual Abuse in the Third Degree (a B Misdemeanor).


**-Defendant Officer Trotter's Story-**

36. On January 21, 2016, Officer Timothy Trotter, who had been a police officer for approximately four years, was assigned to the anti-crime team of the Manhattan Transit Task Force.

37. As such, Officer Trotter was assigned to patrol the subway, with emphasis on thwarting robberies and sex-related crimes.

38. Officer Trotter had received specialized training with respect to subway sex crimes, which involved identifying common behavioral patterns of would-be perpetrators.

39. These patterns included suspects lingering around train platforms, allowing several trains to go by, and riding the same train back and forth (a.k.a. "looping")—behavior suggesting that a would-be perpetrator is looking for a particular crowd or person to get behind.

40. On the day of Mr. Khan's arrest, Defendant Trotter was working undercover with his partner, Defendant Officer Frank Danoy, who at all times relevant remained next to Trotter.

41. At trial, Trotter testified, consistent with the criminal complaint he signed, that he first came upon T.G., the alleged victim of the crime, on the uptown 2/3 platform at Penn Station, between 6:25 and 6:30PM.  At approximately 6:30PM, Trotter testified that he first observed Mr. Khan.

42. Trotter testified that he observed T.G. pacing back and forth on the platform while texting on her phone, as Mr. Khan allegedly followed T.G. with his left hand in his pocket, staring at her buttocks and "manipulating" his penis.

43. According to Trotter, both T.G. and Mr. Khan allowed at least two trains to go by without boarding, as the alleged pacing and following continued.

44. Finally, approximately five minutes after the second train allegedly came and went, at about 6:35PM, Trotter alleged that a "2" train arrived; Mr. Khan allegedly began to enter the second car, but noticed T.G. was entering the first, so immediately changed course so he could run into the first car "directly" behind her.

45. Trotter alleged that he and Danoy then boarded the train after Mr. Khan.

46. According to Trotter, after the train doors closed, Mr. Khan "immediately" began "thrusting his hips in a back-and-forth motion" into T.G.'s buttocks.

47. In response, according to Trotter, T.G. took a step to the right, at which point Mr. Khan also stepped right, and continued his "hip-to-hip thrust" into her buttocks.

48. According to Trotter, the duration of the trip from Penn Station to Times Square was approximately one minute.

49. Upon arriving at Times Square and exiting the train, Trotter testified that he approached T.G., identified himself as a police officer, and asked if "anything occurred" on the train.

50. Trotter's suggestive question betrayed the fact that neither he, nor Danoy, ever saw Mr. Khan do anything inappropriate, but were instead, seeking to flesh out a baseless hunch and/or recruit an unwitting complainant for a non-existent crime.

51. According to Trotter, T.G. instantly became glassy-eyed, and her hands began to shake.

52. Trotter allegedly asked for T.G.'s identification and asked her to write a statement in his memo book about what had occurred.  Attempting to comply, T.G. described a crowded train, and a man behind her who seemed "inappropriately close."

53. Armed only with this vague and equivocal statement, Trotter directed his partner Danoy to place Mr. Khan under arrest.  Danoy made no effort to challenge, or otherwise intervene, with Trotter's manufactured predicate for arrest.

**-T.G.'s Story-**

54. On January 21, 2016, 32-year-old Long Island-native, T.G., had already had several run-ins with the law.

55. An opiate and/or heroin abuser since the age of 15, her first conviction was for Forgery in the Third degree in connection with an attempt to obtain opiates with a false prescription.

56. After seeking treatment in 2012, T.G. had several relapses, which led to three separate arrests just a few months after that of Mr. Khan.  Specifically, T.G. was arrested May 12, 2016, June 8, 2016, and June 16, 2016, and ultimately convicted of Possession of a Controlled Substance and Driving with a Suspended License.

57. On the date of Mr. Khan's arrest, between 6:00PM and 6:30PM, T.G. testified that she arrived at Penn Station from Mineola, via the Long Island Railroad.  From there, she said she caught the "2" train, en route to a business[4] meeting off the 59th Street[5] stop.

58. In striking contrast to Defendant Trotter's story, T.G. had no recollection of waiting for any length of time at Penn Station for the train to come—nor could she corroborate Trotter's account that she was standing next to the platform edge, pacing, and/or playing with her phone.

59. T.G. testified to being very safety-conscious and aware of what was going on around her.

60. Yet T.G. recalled *nothing* suspicious as she waited for her train to come—she noticed no one shadowing behind her—and nothing caused her to walk away or move to a different part of the platform, as Trotter had alleged.

61. T.G. did not recall allowing several trains to go by, boarding the train when it arrived, or whether she was in the front or back of the train.

62. T.G. testified that the train was very crowded.  However, in contrast to the vague notations she made in Trotter's memo book immediately after the incident, T.G. testified at trial, one year later, that she recalled Mr. Khan pressing up against her backside, and moving back and forth, as though he was "masturbating."

63. T.G. was unable to identify Mr. Khan in Court, or generally describe her attacker, except to say that she didn't "think he was white."

64. T.G. couldn't recall whether she exited the train at 42nd Street or 59th Street—though police records indicate that it was 42nd Street.

---

[4] T.G. was unemployed on the date of Mr. Khan's arrest.
[5] The "2" train does not stop at 59th Street.

65. Upon exiting the train, T.G. did recall a plain clothes police officer running after her, abruptly stopping her, and in her words, "scaring" her.

66. T.G. admitted that she had initially been vague about the nature of the contact she had with her attacker on the train.  She said this was because the officer she was speaking to (i.e., Defendant Trotter) was male, and she did not feel comfortable.

67. When asked whether she had requested to speak with a female officer, so she could provide a more fulsome account of her alleged assault, she admitted that she had not.

68. When T.G. was initially approached by Trotter, she was under no impression that she had just been sexually assaulted, which is why she was frightened by his random and unexpected approach, and unable to provide any real detail about it in Trotter's memo book.

69. T.G.'s criminal history and/or ongoing drug-activities made her particularly averse to contacts with the police, motivating her to go through the motions with Trotter, offering bare minimum cooperation, in hopes of concluding her unwanted and "scary" police contact as quickly as possible—even if it meant adopting a false narrative.

70. T.G. had no expectation that Mr. Khan's case would go to trial, or that she would ever be called upon to testify about it.  Yet already having ratified Trotter's account, at least in part, she had committed to advancing the lie, as best she could, despite not being able to corroborate material portions of it.

71. Alternatively, it was not until a Defendant Officer Trotter *suggested* that T.G. had been assaulted, that she began to entertain or otherwise develop the idea that an assault had possibly occurred.  Over time, T.G. derived details of the alleged incident through her

contacts with law enforcement, but she was never able to truly corroborate Trotter's account, because it never, in fact, occurred.

72. Certified records showing arrivals and departures of uptown "2" and "3" trains at Penn Station establish conclusively that Trotter's account of what happened was false.

73. For example, not a single uptown "2" or "3" train departed Penn Station between 6:30PM and 6:39PM, much less, multiple trains, as Trotter had alleged.

74. In fact, according to the records, the only way Mr. Khan and T.G. could have let two trains pass before boarding a train per Trotter's timeline, would be if they boarded the 6:26PM train, and let the 6:21PM and 6:23PM trains pass—but that would have meant they were both on the platform by about 6:15PM, in stark contrast to Trotter's claim that he first encountered them at 6:30PM.

75. Furthermore, the 6:26PM train did not actually depart Penn Station until 6:29PM, and then took an additional nine minutes and eight seconds to get to Times Square—again, in stark contrast to Trotter's account that the trip from Penn Station to Times Square only took about one minute.

76. Notably, no effort was made to arrest Mr. Khan, until T.G.'s vague and equivocal statement was obtained in Trotter's memo book—despite Trotter and Danoy's alleged observations of Mr. Khan's elaborate conduct, which, if truly observed, would have provided more than enough probable cause to arrest.  It is likewise notable that despite multiple surveillance cameras being mounted about Penn Station and the Times Square subway stations, no footage was ever recovered in support of Trotter's account.

77. Furthermore, the prosecution never called Danoy to testify at trial—giving rise to an inference that any attempts to corroborate Trotter's account would have been futile, and only amplified its falsity.

78. Trotter's account was simply too far removed from reality to corroborate with surveillance footage, train schedules, or for Danoy or T.G. to credibly regurgitate at trial.

79. Accordingly, on January 27, 2017, after a day and a half of testimony, the Honorable Melissa Crane determined, without much fanfare, that the Government had failed to make its case.

80. Mr. Khan was acquitted of all the Defendants' fabricated charges, and his case was summarily dismissed.

81. However, the harms inflicted by the Defendants on Mr. Khan, his family, and business, continue to this day.

## AS AND FOR THE FIRST CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF AGAINST DEFENDANTS TROTTER AND DANOY

### Violation of Constitutional Rights Under Color of State Law

### —False Arrest—

82. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 81.

83. The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials and prohibits law enforcement officers from arresting and detaining individuals in the absence of appropriate authorization.  The Fourth Amendment also precludes police officers from

conducting arrests in the absence of probable cause to believe that a crime has been

committed.

84.  The actions of Defendants detailed above violated Janbaz Khan's rights under the United

States Constitution.  Given the total absence of any legal justification for the Plaintiff's

arrest and the Defendant officers' blatant manufacturing of evidence, it was not

objectively reasonable for the Defendant officers to arrest Mr. Khan for anything on

January 21, 2016.

85.  Defendants' actions were motivated by bad faith and malice, and/or deliberate

indifference to the rights of Janbaz Khan.

86.  This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983,

given that said actions were undertaken under color of state law.

87.  As a direct and proximate result of the unconstitutional acts described above, Plaintiff

Janbaz Khan has been substantially injured.


## AS AND FOR THE SECOND CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANTS TROTTER AND DANOY

### Violation of Constitutional Rights Under Color of State Law
### —Malicious Prosecution—

88. Plaintiff incorporates by reference and realleges each and every allegation stated in

Paragraphs 1 through 87.

89. The Fourth Amendment of the United States Constitution protects citizens from

overzealous and malicious prosecution by government officials without probable cause.

90. The Plaintiff was prosecuted, without probable cause, relative to the January 21, 2016

arrest of Janbaz Khan, as set forth herein.

91. Said charges resulted in a loss of liberty for the Plaintiff, as he was incarcerated and forced to make multiple mandatory court appearances, up to and including his trial, as a result of the aforedescribed false and improper charges and incurred substantial financial and emotional damages as a direct result.

92. The Plaintiff's criminal proceeding was terminated in his favor, as the Plaintiff was acquitted at trial on or about January 27, 2017.

93. Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of the Plaintiff.

94. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

95. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been substantially injured.


**AS AND FOR THE THIRD CAUSE OF ACTION**
**ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANTS TROTTER AND DANOY**

**Violation of Constitutional Rights Under Color of State Law**

**-Denial of Constitutional Right to Fair Trial Due to Fabrication of Evidence-**

96. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 95.

97. Defendants created false evidence against Plaintiff Janbaz Khan.

98. Defendants forwarded false and material evidence and information to prosecutors in the New York County District Attorney's office.

99. Defendants misled the judge and the prosecutors by creating false evidence against Plaintiff Janbaz Khan.

100. In creating false evidence against Plaintiff Janbaz Khan, in forwarding false evidence and information to prosecutors, Defendants violated Plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

101. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

102.  As a direct and proximate result of the unconstitutional acts described above, Plaintiff Janbaz Khan has been substantially injured.


**AS AND FOR THE FOURTH CAUSE OF ACTION**
**ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANTS TROTTER AND DANOY**

**Violation of Constitutional Rights Under Color of State Law**

**-Failure to Intervene-**

103.  Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 102.

104.  The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials and prohibits law enforcement officers from arresting and detaining individuals in the absence of appropriate authorization.  The Fourth Amendment also precludes police officers from conducting arrests in the absence of probable cause to believe that a crime has been committed.

105.  The actions of Defendants detailed above violated Mr. Khan's rights under the United States Constitution.  It is widely recognized that all law enforcement officials have an

affirmative duty to intervene to protect the clearly established constitutional rights of citizens from infringement by other law enforcement officers in their presence.

106.  At all times relevant herein, the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedures, as well as the right to be free from restraints on speech and bodily movement, were clearly established constitutional rights that a reasonable person would have known.

107.  Defendants' actions were motivated by bad faith and malice, and/or deliberate indifference to the rights of Mr. Khan.

108.  This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

109.  As a direct and proximate result of the unconstitutional acts described above, Plaintiff Janbaz Khan has been substantially injured.


### AS AND FOR THE FIFTH CAUSE OF ACTION
### ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANTS TROTTER AND DANOY

#### Violation of Constitutional Rights Under Color of State Law

#### -Conspiracy to Violate Plaintiff's Civil Rights-

110.  Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 109.

111.  Defendant police officers, as state actors in their individual capacities pursuing personal interests wholly separate and apart from that of the City of New York or New York City Police Department, conspired together, reached a mutual understanding, and overtly acted in concert to undertake a course of conduct violative of the Plaintiff's constitutional rights by:

a.   Agreeing to intentionally fabricate a legal justification for the unauthorized
arrest of the Plaintiff as aforedescribed;

b.   Agreeing to deliberately and maliciously fabricate evidence against the
Plaintiff as aforedescribed;

c.   Agreeing to falsely arrest, imprison, and prosecute the Plaintiff as
aforedescribed;

d.   Agreeing to contrive false charges against the Plaintiff, as aforedescribed.

112.  This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983,
given that said actions were undertaken under color of state law.

113.  Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference
to the rights of Mr. Khan.

114.  As a direct and proximate result of the unconstitutional acts described above, the
Plaintiff has been substantially injured.


**AS AND FOR THE SIXTH CAUSE OF ACTION
ON BEHALF OF THE PLAINTIFF AGAINST THE CITY OF NEW YORK**

**Violation of Constitutional Rights Under Color of State Law
-Implementation of Municipal Policies, Practices, and Customs that Directly Violate
Constitutional Rights, Failure to Implement Municipal Policies to Avoid Constitutional
Deprivations and Failure to Train and Supervise Employees
Under Color of State Law-**


115.  Plaintiff incorporates by reference and realleges each and every allegation stated in
Paragraphs 1 through 114.

116.  Upon information and belief, Defendant City of New York and Doe #1-10 who were
supervisors and final decision makers, as a matter of policy, practice, and custom, have

acted with a callous, reckless and deliberate indifference to the Plaintiff's constitutional rights and laws of the United States, in that they failed to adequately discipline, train, supervise or otherwise direct police officers concerning the rights of citizens, and not making arrests without probable cause to believe a crime has been committed.

117.  In the alternative, and upon information and belief, Defendants City of New York and Doe #1-10 instituted policies addressing the topics listed above, but through deliberate indifference to the same culture of gross negligence, carelessness, and malice displayed by Defendant officers and/or improperly pressuring officers to meet certain arrest quotas regardless of whether probable cause was present, demonstrated a willful indifference to the constitutional rights of the Plaintiff.

118.  Defendant(s) also, upon information and belief, demonstrated deliberate indifference to the rights of those arrested in the City of New York by failing to adequately hire, screen, train, and supervise the Defendant officers.

119.  In August of 2013, federal Judge Shira A. Sheindlin of the Southern District of New York found the New York City Police Department resorted to a "policy of indirect racial profiling" as officers routinely stopped "blacks and Hispanics who would not have been stopped if they were white."  The Plaintiff in this case is a Pakistani-born citizen of the United States.

120.  It is also true that following the landmark Floyd v. City of New York, 959 F.Supp. 2d 540 (S.D.N.Y. 2013), Judge Scheindlin appointed a monitor to oversee the N.Y.P.D.'s compliance with Court Ordered remedies.  (Id. at 543.)  While the "stop and frisk" in Floyd is not specifically at issue in the present case, the related issues of racial profiling[6],

---

[6] See Crime and Enforcement Activity in New York City (Jan 1 – Dec 31, 2016), (approximately 80% of misdemeanor sex crime arrestees in 2016 were people of color), available at

numbers-driven policing, and inadequate monitoring and supervision of officers certainly are—and it is notable that the N.Y.P.D. monitor's  2/16/2016 report (released just three weeks after Mr. Khan's arrest) emphasized that departmental reforms "need[] to be communicated and reinforced better, not just at the top, but throughout the Department….Ultimately, this is a challenge of leadership, particularly for those who supervise officers engaged in day-to-day enforcement activities—sergeants, their immediate supervisors, and the precinct and unit commanders who set the tone for those under them.  This challenge implicates every aspect of the court orders and the parties' agreements, and it will not be met without changes in policies, training, supervision, and all the ways the NYPD incentivizes good police behavior and discourages unacceptable behavior.  This is a large task that will take time and substantial effort to accomplish."

121.  The same year Judge Scheindlin made her landmark ruling in Floyd, Mayor Bill De Blasio ran his first campaign[7] in substantial part on the need for "much needed reforms," with the NYPD, calling for "new leadership," the appointment of an "inspector general," to oversee the NYPD, and the introduction of a "strong racial profiling bill."

122.  It is likewise notable that during the same period as the instant case, NYPD Transit Officer Edwin Raymond became the lead Plaintiff in a class action suit against the City of New York and others, amidst allegations that he and other officers had been denied promotions for refusing to comply with departmental policies requiring officers to meet fixed numerical goals for arrests (i.e., quotas).  (See Raymond, et al., v. City of New York, et al., 15-CV-6885 (LTS)).

---

https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/year-end-2016-enforcement-report.pdf.

[7] See Bill DeBlasio campaign website @ http://www.billdeblasio.com/issues/crime-fighting-public-safety

123.  Among the reported departmental complaints against Raymond was that he was not "proactive"[8] enough as an officer (i.e., his arrest numbers were too low).  The Raymond class action is still pending in federal court.

124.  In contrast to Officer Raymond, at the time of Mr. Khan's trial, Defendant Trotter testified that he was in the process of being *promoted* to the rank of Detective.

125.  It is likewise notable that in 2016, the year of Mr. Khan's arrest, the New York City Police Department ("NYPD") embarked upon a highly publicized[9] campaign aimed at eradicating subway sex crime.  Reportedly, as of June of 2016, there was a nearly 57% increase in recorded sex crimes from the previous year.

126.  According to NYPD Transit Chief Joseph Fox, "[M]ost arrests for these crimes come from officer-initiated enforcement—where [] plain clothes officers observe elements of a crime and intervene…".  Fox also attributed the increase to the NYPD's "doubling down" on efforts to encourage reporting.

127.  This is significant to Mr. Khan, because "officer-initiated enforcement" in his case manifested in a plain clothes police officer running after the alleged victim ("T.G.") when she got off the train, abruptly stopping her, and in her words, "scaring" her, as aforedescribed.

---

[8] See A Black Police Officer's Fight Against the N.Y.P.D.: Edwin Raymond thought he could change the department from the inside.  He wound up the lead plaintiff in a lawsuit brought by 12 minority officers., New York Times Magazine, Feb. 18, 2016, available at https://www.nytimes.com/2016/02/21/magazine/a-black-police-officers-fight-against-the-nypd.html?_r=0.

[9] See, e.g., Chief of Transit Joseph Fox's Statement Before MTA NYCT Committee, NYPD News, June 20, 2016, available at http://nypdnews.com/2016/06/chief-of-transit-joseph-foxs-statement-before-mta-nyct-committee/; Subway Sex Crimes Soar ans More Victims Come Forward, NYPD Transit Chief Says, NY 1, June 21, 2016, available at http://www.ny1.com/nyc/all-boroughs/transit/2016/06/20/subway-sex-crime-stats-soar-as-more-victims-come-forward--nypd-transit-chief-says.html; NYPD Report Reveals Horrifying Spike in Subway Sex Crimes Over the Last Three Years, New York Daily News, June 6, 2017, available at http://www.nydailynews.com/news/politics/subway-sex-crimes-spike-3-years-nypd-report-shows-article-1.3226788.

128.  The nature, regularity, and scale of such revelations, gives rise to an inference of systemic incompetence and corruption on the part of the New York City Police Department, as such a legacy of injustices cannot plausibly be laid at the feet of a few rogue officers.

129.  The policies, procedures, customs and practices of the above-referenced Defendants violated the Constitutional rights of the Plaintiff.

130.  This conduct on the part of Defendants also represents a violation of 42 U.S.C § 1983, given that said actions were undertaken under color of state law.

131.  As a direct and proximate result of the unconstitutional acts and policies described above, the Plaintiff has been substantially injured.

## DEMAND FOR PUNITIVE DAMAGES

132. The actions of Defendants described herein were extreme and outrageous and shock the conscience of a reasonable person.  Consequently, an award of punitive damages is appropriate to punish the named Defendants.  The Plaintiff does not seek punitive damages against the City of New York.

## DEMAND FOR TRIAL BY JURY

133. The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Janbaz Khan requests that this Honorable Court grant the following relief:

A.  A judgment against Defendants Trotter, Danoy, and Doe(s) for compensatory damages, and punitive damages in an amount to be determined by a properly charged jury;

B.  A judgment against the Defendant City of New York for compensatory damages in an amount to be determined by a properly charged jury;

C.  A monetary award for attorneys fees and costs of this action, pursuant to 42 U.S.C. § 1988;

D.  Any other relief this Court finds to be just, proper, and equitable.


Dated:  New York, New York                    Respectfully Submitted By:
        January 4, 2019
                                              The Law Office of Andrew L .Hoffman, P.C.
                                              By:


                                              _____
                                              Andrew L. Hoffman, Esq.
                                              SDNY Bar Code Number: AH2961
                                              261 Madison Avenue, 12 Floor
                                              New York, New York 10016
                                              T:      (212) 736-3935
                                              E: ahoffman@andrewhoffmanlaw.com

23

## <u>ATTORNEY'S VERIFICATION</u>

STATE OF NEW YORK )

                     SS.:

COUNTY OF NEW YORK)

      I, the undersigned, am an attorney admitted to practice in the Courts of the State of New York, say that:

      I am associated with the attorney of record for the Plaintiff, The Law Office of Andrew L. Hoffman, PC, 261 Madison Avenue, 12th FL, New York, New York 10016.

      I have read the foregoing Verified Complaint and knows the contents thereof; that and the same is true to my knowledge, except as to the matters therein stated to be alleged on information and belief, and, as to those matters I believe them to be true.

      My belief as to those matters therein not stated upon knowledge is based on investigation, correspondence, conferences and all facts, data, information, reports, statements, etc. in our file pertaining to this matter.

      The reason I make this Affirmation instead of the Plaintiff is that the Plaintiff is not within the county where Affirmant maintains his office.

      I affirm that the foregoing statements are true under penalties of perjury.

Dated:       New York, New York
             January 4, 2019


                           _____/s_____
                             Andrew L. Hoffman, Esq.