**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**JANBAZ KHAN,**

                  **Plaintiff,**          **19-cv-104 (JGK)**

      **- against -**          **MEMORANDUM OPINION**
                            **AND ORDER**

**CITY OF NEW YORK, ET AL.,**

                  **Defendants.**

**JOHN G. KOELTL, District Judge:**

The plaintiff, Janbaz Khan, brought this suit pursuant to 42 U.S.C. § 1983 against the City of New York ("the City"), Timothy Trotter, Frank Danoy, and Officers John Doe #1-10 alleging false arrest, malicious prosecution, fabrication of evidence, conspiracy, and failure to intervene. The plaintiff also asserts a municipal liability claim against the City.

The defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing all of the plaintiff's claims. The plaintiff brings a motion for sanctions pursuant to Federal Rule of Civil Procedure 11. The defendants also move pursuant to Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) to exclude the affidavit of the plaintiff's expert, Dr. Nancy J. Franklin.[1] For the reasons explained below, the defendants' motion for summary

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

judgment is **granted in part and denied in part**, the plaintiff's motion for sanctions is **denied,** and the defendants' <u>Daubert</u> motion is **denied without prejudice.**

I.

This case arises from the arrest and subsequent prosecution of the plaintiff for a sexual assault that occurred on the New York City subway. The following facts are based on the parties' Local Civil Rule 56.1 statements and supporting papers and are undisputed unless otherwise noted.

On January 21, 2016, at approximately 6:00-6:30 p.m., a woman named T.G.[2] boarded an uptown 2 or 3 train from Penn Station. Plaintiff's Response to Defendants' Statement of Material Facts ("Pl.'s RTSMF"), ECF No. 86 ¶ 5. New York City Police Department ("NYPD") Officer Trotter boarded the same subway car as T.G. Defendants' Statement of Material Facts ("Defs.' SMF"), ECF No. 83 ¶ 6. Officer Danoy testified that he boarded the same train car and was "ghosting" Officer Trotter (that is, staying close to Officer Trotter and making sure Officer Trotter was safe). Danoy Depo., ECF No. 87-2, at 54, 59. But the plaintiff disputes that Officer Danoy boarded the same subway car as Officer Trotter and T.G. Pl.'s RTSMF ¶ 6.[3]

---

[2] For privacy reasons, and as the parties did in their papers, the Court will refer to the complaining victim by her initials.

[3] Officer Trotter testified that he and Officer Danoy were on the same train, but Officer Trotter could not recall whether he and Officer Danoy were in the same car. Trotter Depo., ECF No. 87-6, at 151-52.

As the subway began to leave Penn Station, T.G., who was standing, testified that someone was "pressed up against . . . [her] backside . . ." and that there was "movement back and forth on [her] butt." T.G. Trial Testimony, ECF No. 87-9, at 109-10. T.G. testified that she felt "a lot of pressure, and it was back and forth very close." Id. at 110. She testified that "[i]t felt like somebody was intentionally touching me against my will," "almost as if there was someone pressed up against me masturbating." Id. T.G. testified that she "glanced quickly" behind her and saw that the person touching her was a man. See id. at 111; T.G. Depo., ECF No. 87-7, at 26-27. T.G. stated that she was not sure of the man's ethnicity, but that he did not appear to be African American, Hispanic, or white. See id.; T.G. Trial Testimony, at 111.[4]

T.G. testified that, after glancing at her assailant, she "froze," faced forward, and "star[ed] directly" into the eyes of a different man, who T.G. later learned was Officer Trotter. T.G. Depo., at 21-26, 41-43, 92. T.G. testified that Officer Trotter would have been able to observe the assault based on where he was positioned in the train car. See id. at 43, 92, 96-97. Officer Trotter testified that he "observed [the plaintiff] thrusting his genital area, his penis area against the buttocks

---

[4] The plaintiff is a Pakistani-born United States citizen. Pl.'s RTSMF ¶ 15.

of [T.G.] on the train." Trotter Depo., at 165. Officer Trotter
stated that he did not intervene because the train was moving.
Id. at 176-77.

After the train pulled into Times Square, the next stop,
T.G. and Officer Trotter left the train. Id. at 179; T.G. Depo.,
at 37-38. Officer Trotter followed T.G. off the train,
approached her, and identified himself as an NYPD officer. See
id. at 41-44; Trotter Depo., at 180, 188.[5] T.G. testified that
the two officers who approached her said, in substance, that
"they saw what happened and that he was arrested." T.G. Depo.,
at 44.[6] T.G. told the officers that she "was standing on the
train, and it was very crowded, and this man was pressed up
against [her] extremely close." T.G. Trial Testimony, at 114.
T.G. also wrote the following statement in Officer Trotter's
memo book: "After stepping onto the 2 train, as it was crowded,
a man behind me was moving closer to point of pressing up
against me. I moved and he followed and continued to be
inappropriately close." ECF No. 84-6, at D00012. Officer Danoy

---

[5] The defendants suggest that only Officer Trotter approached T.G., but T.G.
testified that two officers approached her after she exited the train. See
Pl.'s RTSMF ¶ 23.
[6] See also T.G. Depo., at 39, 42, 91; cf. Trotter Trial Testimony, ECF No. 87-
7, at 82 (Q: "You asked [T.G] if anything inappropriate happened on the
train, right?" A: "That's correct.").

arrested the plaintiff at Officer Trotter's direction. <u>See</u> Trotter Depo., at 195; Danoy Depo., at 109-10, 114-15.[7]

The plaintiff was charged with forcible touching and sexual abuse in the third degree, and he was acquitted following a bench trial in January 2017 in New York City Criminal Court, New York County. Defs.' SMF ¶¶ 33-34. T.G. was unable to identify the plaintiff at trial. Pl.'s RTSMF ¶ 14. The plaintiff denies assaulting T.G. <u>Id.</u> ¶ 20. The plaintiff also disputes that the alleged assault occurred at all, and argues that T.G.'s account was the product of leading comments by Officer Trotter. <u>See id.</u> ¶ 10.

## II.

The defendants have moved for summary judgment dismissing all of the plaintiff's claims. The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v.</u>

---

[7] It is unclear whether the plaintiff was arrested before or after T.G. spoke to Officer Trotter. <u>See</u> Pl.'s RTSMF ¶ 99 & n.8. T.G. testified that the officers who approached her told her that they had already arrested the man who assaulted her. <u>See, e.g.</u>, T.G. Depo., at 44 (the officers who approached T.G. said "they saw what happened and that he was arrested"). Officers Danoy and Trotter, by contrast, testified that Officer Trotter received a statement from T.G. before directing Officer Danoy to arrest the plaintiff. <u>See</u> Danoy Depo., at 109-10, 114-15; Trotter Depo., at 194-95. Officer Trotter testified that, after the train arrived at Times Square, he followed T.G. and directed Officer Danoy to follow the plaintiff. <u>See id.</u> at 184-85. Officer Danoy could not recall how he learned that Officer Trotter had received a statement from T.G. <u>See</u> Danoy Depo., at 114-15.

Catrett, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task
at the summary judgment motion stage of the litigation is
carefully limited to discerning whether there are any genuine
issues of material fact to be tried, not to deciding them. Its
duty, in short, is confined at this point to issue-finding; it
does not extend to issue-resolution." Gallo v. Prudential
Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir.
1994). The moving party bears the initial burden of "informing
the district court of the basis for its motion" and identifying
the matter that "it believes demonstrate[s] the absence of a
genuine issue of material fact." Celotex, 477 U.S. at 323. "Only
disputes over facts that might affect the outcome of the suit
under the governing law will properly preclude the entry of
summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248 (1986).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party. See Matsushita Elec. Indus.
Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gallo, 22
F.3d at 1223. "If, as to the issue on which summary judgment is
sought, there is any evidence in the record from any source from
which a reasonable inference could be drawn in favor of the
nonmoving party, summary judgment is improper." Chambers v. TRM
Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving

party meets its burden under Rule 56, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993).

## A.

The first claim at issue is false arrest. "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); see Jenkins v. City of N.Y., 478 F.3d 76, 84 (2d Cir. 2007). To prove false arrest under New York law, the plaintiff must show: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995).

The defendants argue that the plaintiff's false arrest claim fails as a matter of law because there was probable cause to arrest the plaintiff. The existence of probable cause "is a complete defense to an action for false arrest." Weyant, 101 F.3d at 852. "Officers have probable cause when they have

knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Hernandez v. United States, 939 F.3d 191, 199 (2d Cir. 2019). "The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013). "Whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the arresting officers." Yorzinski v. City of N.Y., 175 F. Supp. 3d 69, 76 (S.D.N.Y. 2016).

In this case, there are significant questions of fact surrounding the plaintiff's arrest and the knowledge of the defendant officers at the time of the arrest. In arguing that there was probable cause to arrest the plaintiff, the defendants rely primarily on T.G.'s statements to Officer Trotter following the alleged assault. But whether T.G. made any statements to Officer Trotter before the plaintiff was arrested is a disputed issue of fact. Although Officers Trotter and Danoy testified that Officer Trotter received T.G.'s statement before the plaintiff was arrested, see Danoy Depo., at 109-10, 114-15; Trotter Depo., at 194-95, T.G. consistently testified that the

officers who approached her following the alleged assault said that the assailant had already been arrested, see T.G. Depo., at 39, 42, 44, 91; T.G. Trial Testimony, at 113. Therefore, at this stage, the defendants cannot rely on any statements made by T.G. to Officer Trotter to establish probable cause.

The defendants also rely on the testimony of Officers Trotter and Danoy to establish probable cause. See, e.g., ECF No. 82, at 7-8. But the plaintiff disputes that he committed the alleged assault, that the alleged assault occurred at all, and that the officers observed him at Penn Station before his arrest. See Pl.'s RTSMF ¶¶ 3, 5, 9-10. Moreover, there are conflicts in the record regarding how the alleged assault unfolded, where the defendant officers were positioned in the train car, whether Officer Trotter intervened, and the duration of the train ride from Penn Station to Times Square. See id. ¶¶ 5-6, 9-10. Viewing the evidence in the light most favorable to the plaintiff, the defendants fail to explain: (1) why Officer Trotter did not immediately intervene in what he described as a brazen assault;[8] or (2) how Officer Danoy managed to keep his

---

[8] When asked at his deposition if he intervened "[a]t any point" during the alleged assault, Officer Trotter answered no. Trotter Depo., at 176-77. When asked why he did not intervene, Officer Trotter responded: "For safety reasons, we do not conduct lawful business on a moving train." Id. at 177. Officer Trotter then testified that, "When [T.G.] stepped to her right," Officer Trotter stepped between T.G. and the plaintiff, thereby preventing the plaintiff from following T.G. Id. at 177-78. T.G., by contrast, testified that the assault lasted for the entire duration of the train ride from Penn Station to Times Square. T.G. Depo., at 37. T.G. further testified that Officer Trotter had a clear view of the assault because T.G. and Officer

focus on Officer Trotter without observing the alleged assault, even though there were no people between Officer Trotter and T.G.[9]

The defendants argue that "the undisputed record evidence confirms that plaintiff was the perpetrator," ECF No. 82, at 7, but the defendants ignore the plaintiff's denial. At this stage, the Court must draw all reasonable inferences in favor of the plaintiff, and the Court "may not make credibility determinations or weigh the evidence." Proctor v. LeClaire, 846 F.3d 597, 608 (2d Cir. 2017); see also Simpson v. City of N.Y., 793 F.3d 259, 265 (2d Cir. 2015) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Whether the officers had probable cause to arrest the plaintiff is a question of fact for the jury. Accordingly, the defendants are not entitled to summary judgment on the plaintiff's false arrest claim.[10]

---

Trotter were holding onto the same subway pole, facing each other, and there was nobody in between them. See id. at 96–99. T.G. "vividly" recalled "staring directly in [Officer Trotter's] eyes" during the assault. Id. at 25.

[9] Officer Danoy testified that he recalls observing Officer Trotter during the train ride and that there was nothing obstructing his view of Officer Trotter. Danoy Depo., at 84. Officer Danoy testified that he did not witness any criminal activity on the train. Id. at 87.

[10] The defendants argue that, "[a]t an absolute minimum, there was probable cause to arrest plaintiff for harassment in the second degree based solely on T.G.'s written statement." ECF No. 82, at 8. But, as explained, whether T.G. gave any statement to Officer Trotter before the plaintiff was arrested is a disputed issue of fact. Therefore the Court cannot conclude, as a matter of law, that the officers had probable cause to arrest the plaintiff for harassment in the second degree.

**B.**

The second claim at issue is malicious prosecution. The elements of a malicious prosecution claim under § 1983 are substantially the same as the elements under New York law. Boyd v. City of N.Y., 336 F.3d 72, 75 (2d Cir. 2003). "To succeed on a claim for malicious prosecution, the plaintiff must show that a prosecution was initiated against him, that it was brought with malice but without probable cause to believe that it could succeed and that the prosecution terminated in favor of the accused plaintiff." Id. at 76.

The defendants argue that the plaintiff's malicious prosecution claim fails because the plaintiff's prosecution was supported by probable cause. In support of this argument, the defendants rely on their probable cause argument with respect to the plaintiff's false arrest claim. However, as explained with respect to the plaintiff's false arrest claim, the defendants cannot establish as a matter of law that the plaintiff's arrest was supported by probable cause. While the probable cause inquiry in a malicious prosecution claim is distinct from the probable cause inquiry in a false arrest claim, especially where the prosecution follows a warrantless arrest, see Mejia v. City of N.Y., 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000),[11] the

---

[11] In cases such as this one where prosecution followed a warrantless arrest, "the existence, or lack, of probable cause [for the prosecution] is measured as of the time the judicial proceeding is commenced (e.g., the time of the

defendants do not explain how that distinction affects this case. Even though it appears that the Court could consider T.G.'s statements to Officer Trotter in assessing whether the plaintiff's prosecution was supported by probable cause, the plaintiff has shown that "the circumstances raise doubt as to [T.G.'s] veracity." Panetta v Crowley, 460 F.3d 388, 395 (2d Cir. 2006). For example, T.G. did not describe her alleged assailant in her statement to Officer Trotter; T.G. could not recall the ethnicity of her alleged assailant, T.G. Trial Testimony, at 111; and T.G. could not identify the plaintiff at trial and was not asked to identify the plaintiff prior to trial, Pl.'s RTSMF ¶ 14. Moreover, the fact that Officer Trotter approached T.G. using language suggesting that a crime had occurred (that the officers "saw what happened" and had already made an arrest, see T.G. Depo., at 44)[12] casts doubt on T.G.'s account. Accordingly, the defendants cannot show as a matter of law that there was probable cause to prosecute the plaintiff.

The defendants also argue that the plaintiff cannot show that his prosecution was brought with malice. But "[o]nce [the court] find[s] an issue of material fact as to probable cause,

_____

arraignment), not the time of the preceding warrantless arrest." Mejia, 119 F. Supp. 2d at 254.
[12] NYPD Inspector Thomas Ponella testified that officers should not approach a potential victim by saying "I saw what happened" because, as Inspector Ponella put it, "We want to get the victim's own words." Ponella Depo., ECF No. 87-14, at 66.

the element of malice also becomes an issue of material fact as well. A lack of probable cause generally creates an inference of malice." Boyd, 336 F.3d at 78; see Manganiello v. City of N.Y., 612 F.3d 149, 163 (2d Cir. 2010). Accordingly, the defendants are not entitled to summary judgment on the plaintiff's malicious prosecution claim.

### C.

The third claim at issue is that the defendants deprived the plaintiff of his right to a fair trial by fabricating evidence. "A person suffers a constitutional violation if an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." Jovanovic v. City of N.Y., 486 F. App'x 149, 152 (2d Cir. 2012); see Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997).

In this case, there is a genuine dispute of fact regarding whether the defendant officers fabricated information in the course of effecting the plaintiff's arrest. The plaintiff alleges that the officers lied about observing a crime and about observing the plaintiff commit that alleged crime. The plaintiff has sworn that he did not commit the alleged assault. Pl.'s RTSMF ¶¶ 20, 112. The plaintiff has also highlighted several discrepancies between the testimony of the officers and T.G.

regarding the alleged assault. Moreover, there is evidence that Officer Trotter approached T.G. in a manner that suggested a crime had occurred. Finally, viewing the evidence in the light most favorable to the plaintiff, the defendant officers do not explain satisfactorily: (1) why Officer Trotter did not intervene in the brazen sexual assault that he allegedly witnessed while holding onto the same subway pole as the alleged victim, or (2) how Officer Danoy, who testified that he was closely observing Officer Trotter during the train ride in question, could have failed to notice the alleged assault. Accepting the plaintiff's account, as the Court must at this stage, there is a dispute of fact about whether the officers lied about what they saw in order to effect the plaintiff's arrest and further his prosecution. See Robinson v. City of N.Y., No. 15-cv-5850, 2017 WL 2414811, at *5 (S.D.N.Y. June 2, 2017) ("Although whether Defendants fabricated their observations is factually disputed, if the jury were to credit Plaintiff's evidence, it could reasonably find for Plaintiff on his fair trial claim.").[13]

   The defendants note that "a mere difference in the testimony of the plaintiff and the officers about what occurred

---

[13] While Officer Trotter was officially the arresting officer and signed the criminal complaint, Pl.'s RTSMF ¶ 109; ECF No. 84-8, Officer Danoy assisted in processing the plaintiff's arrest paperwork, Danoy Depo., at 121. This paperwork memorialized allegations that, the plaintiff argues, Officer Danoy knew were false. Cf. Robinson, 2017 WL 2414811, at *5.

on the day of the arrest is not sufficient evidence to create a genuine dispute of material fact as to whether [the officers] intentionally falsified information or fabricated evidence." Lauderdale v. City of N.Y., No. 15-cv-1486, 2018 WL 1413066, at *8 (S.D.N.Y. Mar. 19, 2018). But Lauderdale involved an allegation of mistaken identification; the plaintiff there did not dispute that the defendant officers had witnessed criminal activity. See id. at *4-5. Here, by contrast, the plaintiff disputes that the defendant officers witnessed any criminal activity.

Accepting the plaintiff's account as true, a reasonable juror could find that the defendant officers fabricated evidence that was likely to influence a jury's decision, forwarded that information to prosecutors, and that the plaintiff suffered a deprivation of liberty as a result.[14] Therefore summary judgment is not warranted with respect to the plaintiff's fair trial claim.

**D.**

The next claim at issue is that Officers Trotter and Danoy conspired to violate the plaintiff's constitutional rights. To prevail on this claim, the plaintiff must show: "(1) an agreement between a state actor and a private party; (2) to act

---

[14] The defendants do not argue in this motion that the plaintiff was not deprived of his liberty as a result of any fabricated information forwarded to prosecutors by the defendant officers.

in concert to inflict an unconstitutional injury; and (3) an
overt act done in furtherance of that goal causing damages."
Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324-25 (2d Cir.
2002). Because a conspiracy must involve two or more legal
entities, "under the intracorporate conspiracy doctrine,
officers, agents and employees of a single corporate entity are
legally incapable of conspiring together." Hartline v. Gallo,
546 F.3d 95, 99 n.3 (2d Cir. 2008). However, "the intracorporate
conspiracy doctrine does not apply to bar conspiracy claims
against individuals within a single entity when they are
pursuing personal interests wholly separate and apart from the
entity." Ali v. Connick, 136 F. Supp. 3d 270, 282 (E.D.N.Y.
2015).

The plaintiff argues that this "personal stake exception"
applies in this case because, "given the vast web of factual
disputes, a reasonable jury could conclude that the officers
were driven by factors separate from the entity such as racial
animus or the procurement of overtime pay." ECF No. 85, at 13.
But while there is a dispute of fact regarding whether an
assault occurred, the plaintiff's allegations that the officers
lied about what they witnessed because of personal interests are
based on sheer speculation. The plaintiff notes that the vast
majority of people arrested by the defendant officers for sex
crimes were people of color. The plaintiff also notes that

16

Officers Trotter and Danoy received overtime pay as a result of the plaintiff's arrest. See id. But there is no evidence in the record suggesting that the officers were motivated by racial animus in this case or the procurement of overtime pay when they arrested the plaintiff. The plaintiff's speculation is insufficient to defeat a motion for summary judgment. See Moroughan v. Cnty. of Suffolk, 514 F. Supp. 3d 479, 529-30 (E.D.N.Y. 2021) (granting summary judgment dismissing § 1983 conspiracy claims against certain defendants where those claims were based on "speculation and conjecture"). Accordingly, the defendants' motion for summary judgment is granted with respect to the plaintiff's § 1983 conspiracy claim.

**E.**

The next claim at issue is failure to intervene. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to

17

intervene." <u>Jean-Laurent v. Wilkinson</u>, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

The plaintiff asserts this claim against Officers Trotter and Danoy, Compl., at 16, but it is only conceivable against Officer Danoy. When a law enforcement officer is a direct participant in the alleged constitutional violation, a failure to intervene theory is inapplicable. <u>See</u> <u>Buchy v. City of White Plains</u>, No. 14-cv-1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (excessive force). It is plain that Officer Trotter was a direct participant in any constitutional violation that the plaintiff suffered: Officer Trotter directed Officer Danoy to arrest the plaintiff, and Officer Trotter's observations of the alleged assault—potentially in combination with the statement Officer Trotter obtained from T.G.—formed the basis for the plaintiff's arrest. No reasonable juror could find that Officer Danoy, but not Officer Trotter, directly participated in any constitutional violation. Accordingly, the plaintiff's failure to intervene claim against Officer Trotter is dismissed.[15]

---

[15] The plaintiff seeks to hold Officer Danoy liable both as a direct participant in the alleged constitutional violations and under a failure to intervene theory. Although Officer Danoy cannot be held liable under both of these theories, he may be held liable under one or the other, and the plaintiff is permitted to pursue both theories of liability in the alternative, even though they are mutually inconsistent. <u>See</u> <u>Buchy</u>, 2015 WL 8207492, at *3; <u>Cumberbatch v. Port Auth. of N.Y. and N.J.</u>, No. 03-cv-749, 2006 WL 3543670, at *11 (S.D.N.Y. Dec. 5, 2006).

With respect to Officer Danoy, there are disputes of material fact as to whether he failed to intervene in the alleged constitutional violations by Officer Trotter. Officer Danoy testified that he was in the train car when the alleged assault occurred and that he had a clear view of Officer Trotter. Danoy Depo., at 84. Officer Trotter and T.G. were holding onto the same subway pole, and no one was in between them. T.G. Depo., at 96-99. Accepting the plaintiff's account that no assault occurred, a reasonable juror could conclude that: a reasonable officer would have known that the plaintiff was being arrested and prosecuted without probable cause, Officer Danoy had a realistic opportunity to intervene, and Officer Danoy did not take reasonable steps to intervene.

The defendants argue that Officer Danoy is shielded from liability by the collective knowledge doctrine. "Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001). "There can be no collective knowledge, however, if the initiating officer lacked probable cause -- i.e., in that event no other officer

can rely on the information of the initiating officer."
Hernandez, 939 F.3d at 209. Because it is disputed whether
Officer Trotter had probable cause to arrest the plaintiff,
Officer Danoy is not entitled to summary judgment based on the
collective knowledge doctrine. Moreover, a reasonable juror
could conclude that Officer Danoy acted unreasonably when he
arrested the plaintiff at Officer Trotter's direction given that
Officer Danoy did not witness any criminal activity even though
he had a clear view of Officer Trotter (who was sharing a subway
pole with T.G.) when the alleged assault occurred. See Panetta,
460 F.3d at 395 ("The determination of probable cause does not
turn on whether the fellow agent's observations were accurate,
but on whether the arresting agent was reasonable in relying on
those observations.").

Beyond seeking to dismiss the plaintiff's failure to
intervene claim, the defendants argue that all of the
plaintiff's claims against Officer Danoy fail because, in
general, "police officers are entitled to rely on the
allegations of fellow police officers." Id. This argument fails
because it is disputed (1) whether any officer had probable
cause to arrest the plaintiff, and (2) whether Officer Danoy
acted reasonably in relying on Officer Trotter's observations.

Accordingly, the claims against Officer Danoy are not dismissed, and summary judgment as to the plaintiff's failure to intervene claim against Officer Danoy is denied.

**F.**

The defendants next argue that Officers Trotter and Danoy are entitled to qualified immunity. "Qualified immunity protects government officials from civil damages liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Jones v. Treubig, 963 F.3d 214, 224 (2d Cir. 2020). "[W]hen an official raises qualified immunity as a defense, the court must consider whether: (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." Id.

There is no question that the right to be free from arrest and prosecution without probable cause was clearly established at the time of the plaintiff's arrest and prosecution. See Gonzalez, 728 F.3d at 157; Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002). However, because officers are entitled to qualified immunity if they reasonably could have believed that their actions were lawful, Officers Trotter and Danoy would be entitled to qualified immunity if they had "arguable probable cause" to arrest the plaintiff. See Simpson, 793 F.3d at 268;

21

Betts v. Shearman, 751 F.3d 78, 83 (2d Cir. 2014). Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Simpson, 793 F.3d at 268.

The defendants argue that Officers Trotter and Danoy "are entitled to qualified immunity because they reasonably believed, even if mistaken, that there was probable cause to arrest plaintiff, at a minimum, based on the voluntary statement written by T.G. in Trotter's memobook." ECF No. 82, at 15. The defendants note that police officers are generally entitled to assume the veracity of civilian complaints. "[A] law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." Panetta, 460 F.3d at 395. But in this case, viewing the evidence in the light most favorable to the plaintiff, a reasonable juror could conclude that the circumstances raise doubt as to T.G.'s veracity. Officer Trotter approached T.G. using language suggesting that a crime had occurred, T.G. did not describe her assailant in her written statement even though she testified she glanced back at her assailant, and a reasonable juror could disbelieve that T.G.

suffered a minutes-long assault while a police officer—who was at most a few feet from T.G.—looked directly at her and failed to intervene. Accordingly, the officers did not have arguable probable cause to arrest the plaintiff based on T.G.'s written statement.

Accepting the plaintiff's version of events as true, no criminal activity occurred on the train, and Officers Trotter and Danoy arrested the plaintiff and assisted in his prosecution knowing that they lacked probable cause. Accordingly, the Court cannot conclude at this stage that there was arguable probable cause to arrest the plaintiff, and the officers are not entitled to qualified immunity.

**G.**

The defendants also move for summary judgment dismissing the plaintiff's Monell claim against the City.

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. But, under § 1983, local governments are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions. Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.

Connick v. Thompson, 563 U.S. 51, 60–61 (2011). The plaintiff
pursues several theories of Monell liability, although the
theories are not clearly delineated. First, the plaintiff argues
that the City failed to train or supervise its officers with
respect to how to approach and communicate with potential sex
crime victims. Second, and relatedly, the plaintiff argues that
the City failed to train or supervise its officers with respect
to the use of the "Victim's Statement of Allegations Form"—a
particular form intended to record the accounts of crime
victims. Third, the plaintiff pursues an amorphous theory
relating to the NYPD's alleged use of arrest quotas. Finally,
the plaintiff pursues a theory based on an equal protection
violation, although the Complaint does not assert an equal
protection claim.

1.

    "In limited circumstances, a local government's decision
not to train certain employees about their legal duty to avoid
violating citizens' rights may rise to the level of an official
government policy for purposes of § 1983. A municipality's
culpability for a deprivation of rights is at its most tenuous
where a claim turns on a failure to train." Id. at 61. "To
satisfy the statute, a municipality's failure to train its
employees in a relevant respect must amount to deliberate
indifference to the rights of persons with whom the untrained

24

employees come into contact." Id. The Second Circuit Court of
Appeals has framed the deliberate indifference inquiry in three
parts: "First, the plaintiff must show that a policymaker knows
to a moral certainty that her employees will confront a given
situation." "Second, the plaintiff must show that the situation
either presents the employee with a difficult choice of the sort
that training or supervision will make less difficult or that
there is a history of employees mishandling the situation."
"Finally, the plaintiff must show that the wrong choice by the
city employee will frequently cause the deprivation of a
citizen's constitutional rights." Walker v. City of N.Y., 974
F.2d 293, 297–98 (2d Cir. 1992).

   "'Deliberate indifference' is a stringent standard of
fault, requiring proof that a municipal actor disregarded a
known or obvious consequence of his action. Thus, when city
policymakers are on actual or constructive notice that a
particular omission in their training program causes city
employees to violate citizens' constitutional rights, the city
may be deemed deliberately indifferent if the policymakers
choose to retain that program." Connick, 563 U.S at 61. "A
pattern of similar constitutional violations by untrained
employees is ordinarily necessary to demonstrate deliberate
indifference for purposes of failure to train." Id. at 62; see
also Hernandez, 939 F.3d at 206–07.

All of the plaintiff's Monell theories trace back to the
NYPD's "enhanced approach" to combating subway sex crime, an
initiative started by the NYPD Transit Bureau in 2014. Pl.'s
RTSMF ¶¶ 35-36. The initiative consisted of advertising
campaigns designed "to raise awareness of the seriousness with
which the NYPD takes sexually motivated offenses and also to
publicize the ways in which sexually motivated offenses could be
reported." Defs.' SMF ¶ 38. The initiative "also consisted of
specialized trainings for police officers, the placement of
additional plainclothes female police officers in the transit
system, and the creation of a victim impact statement form." Id.
¶ 39. The parties agree that, as a result of the NYPD's enhanced
approach, complaints of—and arrests for—sexually motivated
offenses increased. Id. ¶¶ 40-41. From the beginning of 2014 to
the end of 2016, the year the plaintiff was arrested, there was
a 39.5% increase in forcible touching and third-degree sex abuse
arrests by the NYPD. Pl.'s RTSMF ¶ 153. According to the
plaintiff, a vast majority of the increase in arrests was a
product of "officer-initiated enforcement," "where plainclothes
officers would approach a prospective complainant, identify
themselves as police, obtain a written statement, and effect the
arrest." Id. ¶ 117.

The plaintiff asserts that the NYPD had notice that "the
success of the officer's approach and communication with

prospective victims was an essential component to the 'enhanced approach.'" ECF No. 85, at 19.[16] The plaintiff also emphasizes that, although the number of arrests for sex crimes increased in 2016, the percentage of cases that were sealed by operation of law remained relatively unchanged from 2015. Id.; see Defs.' SMF ¶¶ 47-48.[17] The plaintiff argues that the NYPD did not train its officers adequately with respect to how to approach and communicate with potential victims of sex crimes, and that a wrong choice by officers in this regard frequently caused the deprivation of constitutional rights.

This theory of Monell liability fails because the plaintiff has adduced no evidence that any failure to train officers with respect to approaching potential victims has resulted in constitutional deprivations. Indeed, far from showing "[a] pattern of similar constitutional violations by untrained employees," Connick, 563 U.S. at 62, the plaintiff has not produced evidence of even one prior constitutional violation that can be linked to this alleged training failure. The

---

[16] In support of this conclusion, the plaintiff cites (1) a statement by NYPD Transit Chief Joseph Fox acknowledging that subway sex crime victims are generally more comfortable speaking with female officers than male officers, and (2) a statement by Chief Fox that the NYPD had formed a training partnership with a group called Hollaback to "help [NYPD] officers understand the unique nature of these personal crimes and establish victim's trust." ECF No. 85, at 19.

[17] Under New York law, records of criminal proceedings that terminate in favor of the accused person are generally sealed. See N.Y. Crim. Proc. Law § 160.50 (McKinney 2021). Accordingly, sealed arrests reflect cases that terminated in favor of the accused.

plaintiff asserts that constitutional deprivations have occurred frequently because nearly half of the forcible touching and third-degree sex abuse arrests in 2016 were sealed. See ECF No. 85, at 21; Defs.' SMF ¶ 48. But the plaintiff has provided no evidence that the sealed arrests at issue involved constitutional deprivations; the plaintiff has also provided no evidence that any training deficiency with respect to approaching potential victims played any role in the sealing of those arrests. Accordingly, the plaintiff has failed to show that the City was on "actual or constructive notice that a particular omission in [its] training program causes city employees to violate citizens' constitutional rights." Connick, 563 U.S. at 61; see also Hernandez, 939 F.3d at 207.[18]

---

[18] While the Supreme Court has left open the possibility "that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations," Connick, 563 U.S. at 64; see City of Canton, Ohio v. Harris, 489 U.S. 378, 390 & n.10 (1989), this is not such a case. The hypothetical example of single-incident liability posed by the Court in Canton involved a city that "deploys [] armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights." Connick, 563 U.S. at 63–64. In this case, no reasonable juror could conclude that the violation of arrestees' constitutional rights is the "highly predictable consequence" of failing to train officers with respect to approaching potential victims of sex crimes; it is far from "patently obvious," id. at 64, that an officer approaching a potential victim by saying something along the lines of "I saw what happened" would result in a false arrest or any other constitutional violation. This case is also unlike the Canton hypothetical because the record establishes (and the plaintiff does not dispute) that officers receive general training with respect to approaching crime victims. See Fox Depo.,

This theory of <u>Monell</u> liability also fails for the independent reason that the plaintiff cannot show causation. <u>Monell</u> plaintiffs must "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 129 (2d Cir. 2004) (Sotomayor, J.) (quoting <u>Canton</u>, 489 U.S. at 391). The plaintiff must show causation in order to "ensure that a failure to train theory does not collapse into <u>respondeat superior</u> liability." <u>Id.</u> at 130. In this case, the plaintiff alleges that Officer Trotter directed Officer Danoy to arrest the plaintiff even though Officer Trotter knew that no crime had occurred, and that Officer Danoy failed to intervene. These are allegations of intentional misconduct by the officers. Any injury suffered by the plaintiff was the direct result of that intentional misconduct, not the suggestive language used by Officer Trotter

---

ECF No. 87-17, at 30–32, 112; Ponella Depo., at 65. The plaintiff instead alleges that the NYPD fails to train its officers with respect to approaching sex crime victims in particular. But because officers are trained with respect to approaching crime victims generally, this is really a challenge to the adequacy of officers' training with respect to sex crime victims, not a challenge to the existence of such training. Such claims cannot proceed under the single-incident theory hypothesized in <u>Canton</u>. See <u>Breitkopf v. Gentile</u>, 41 F. Supp. 3d 220, 254–55 (E.D.N.Y. 2014); <u>cf. Connick</u>, 563 U.S. at 67 (noting "the utter lack of an ability to cope with constitutional situations that underlies the <u>Canton</u> hypothetical"). Accordingly, the plaintiff's attempt to invoke the single-incident theory in this case fails. Because it is far from obvious that the alleged training deficiency would cause constitutional violations, applying the single-incident theory in this case would serve to sidestep <u>Connick</u>'s notice requirement entirely.

in approaching T.G. The plaintiff therefore cannot show that the alleged injury "occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor." Id.; see also id. ("[P]laintiffs have provided no evidence tending to rule out those causes of the excessive force that would not support municipal liability, . . . and therefore no reasonable factfinder could conclude that the excessive force occurred as a result of training deficiencies."); Hernandez, 939 F.3d at 207-08 (asking if the challenged policy was the but-for cause of the alleged injury). Any training to avoid using suggestive language in approaching potential sex crime victims would not have prevented the intentional misconduct that is the cause of the plaintiff's alleged injuries.

In sum, the City is not liable under § 1983 for any failure to train its officers with respect to approaching sex crime victims because (1) there is no pattern of similar constitutional violations and this is not a case where any failure to train was so obvious as to give rise to single-incident liability; and (2) the plaintiff cannot show that his alleged injuries were caused by the allegedly deficient training.

**2.**

The plaintiff's second failure to train theory—namely, that the City failed to train its officers on the use of the Victim's

30

Statement of Allegations Form—fails for similar reasons. The
plaintiff has not provided evidence of any past constitutional
violations caused by an officer's failure to use this specific
form. The plaintiff also cannot show that "the unconstitutional
consequences" of any failure to train officers on using the form
would be "so patently obvious" that the City could be held
liable absent a pre-existing pattern of violations. Connick, 563
U.S. at 64. Finally, the plaintiff cannot show that any
constitutional violation in this case was caused by any failure
to train with respect to use of the form. There is nothing in
the record to suggest that Officer Trotter's use of a more
detailed form to obtain T.G.'s statement would have changed
T.G.'s account. Moreover, because the plaintiff alleges that the
officers arrested him knowing that they lacked probable cause,
the plaintiff cannot show that T.G.'s written statement (which
stated only that an assaulted occurred and did not describe the
assailant) caused the plaintiff's injuries.

Accordingly, the plaintiff's failure to train theory with
respect to use of the Victim's Statement of Allegations Form
fails.

### 3.

The plaintiff's third theory of Monell liability relates to
the NYPD's alleged use of arrest quotas in connection with its
enhanced approach to combating subway sex crime. The plaintiff

cites a variety of inadmissible evidence in support of this theory. For example, the plaintiff cites allegations and factual findings from other cases, some of which are currently pending. Those allegations and findings are not admissible evidence in this case. See, e.g., Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc., 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001) (Weinstein, J.) ("Judicial findings in other cases proffered as evidence are generally characterized as inadmissable hearsay."). The plaintiff also cites the court's description of NYPD documents in Floyd v. City of N.Y., 959 F. Supp. 2d 540, 600 (S.D.N.Y. 2013), but the plaintiff does not establish that those documents accurately describe NYPD practices as of January 2016, when the plaintiff was arrested.

The plaintiff also cites extensively to an affidavit of a former NYPD transit officer submitted in connection with another case. See ECF No. 85, at 25-26. This affidavit is inadmissible hearsay offered for the truth of the matters asserted. The hearsay exception for former testimony does not apply because there is no showing that the witness is unavailable; the plaintiff cites an affidavit, not testimony that "was given . . . at a trial, hearing, or lawful deposition"; and there is no showing that the City had "an opportunity and similar motive to develop" the testimony. Fed. R. Evid. 804(b)(1). The plaintiff's invocation of this third-party affidavit also constitutes an

impermissible attempt to circumvent the disclosure requirements of Federal Rule of Civil Procedure 26, requirements that would have allowed the City to depose the affiant about his knowledge of facts that are relevant to this case.

These inadmissible materials cannot be considered at the summary judgment stage. See Fed. R. Civ. P. 56(c); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) ("In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial."). Moreover, none of these inadmissible materials establish that any quota system played any role in the plaintiff's arrest.

In terms of admissible evidence, the plaintiff points to increased arrest numbers and subway sex crime reports in the years following the NYPD's implementation of its enhanced approach to combating subway sex crime. ECF No. 85, at 24. But this is not evidence of an unconstitutional practice or policy by the City: part of the NYPD's sex crime strategy was to increase reporting of what it perceived to be an underreported crime. See Defs.' SMF ¶ 38; Fox Depo., at 21–22.

The plaintiff has provided no evidence of a quota system or any other unconstitutional pressure to increase arrests in connection with the NYPD's enhanced approach to combating subway sex crime. The plaintiff has also provided no evidence that any

such pressure played any role in his arrest. Accordingly, this
theory of Monell liability also fails.

**4.**

The plaintiff's final Monell theory is framed as an "equal
protection violation." ECF No. 85, at 27. The plaintiff did not
assert a standalone equal protection claim in the Complaint, and
the phrase equal protection does not appear in the Complaint.
"It is well settled that a litigant may not raise new claims not
contained in the complaint in opposition to a motion for summary
judgment." Mediavilla v. City of N.Y., 259 F. Supp. 3d 82, 106
(S.D.N.Y. 2016).

In any event, any Monell theory based on an equal
protection claim would fail. Equal protection claims require
proof of discriminatory purpose: that is, "that the City
selected or reaffirmed a particular course of action at least in
part because of, not merely in spite of, its adverse effects
upon an identifiable group." Davis v. City of N.Y., 959 F. Supp.
2d 324, 360 (S.D.N.Y. 2013). There is no proof whatsoever of
discriminatory purpose in this case. That the NYPD's enhanced
approach to combating subway sex crime involved placing
personnel in areas where sex offenders frequent, Pl.'s RTSMF ¶
172, and the fact that people of color are disproportionately
arrested for forcible touching and third-degree sex abuse, id.
¶¶ 173–78, do not establish that race was a motivating factor in

34

the NYPD's policy for combating subway sex crime. The plaintiff has also provided no evidence that his status as a Pakistani-born United States citizen motivated his arrest. Accordingly, to the extent the plaintiff asserts a theory of <u>Monell</u> liability based on an equal protection violation, that claim also fails.

### III.

The plaintiff also brings a motion for sanctions under Federal Rule of Civil Procedure 11. The plaintiff argues that sanctions are warranted because defense counsel asserts in the defendants' summary judgment papers that Inspector Ponella did not testify as a Rule 30(b)(6) witness even though, the plaintiff claims, Inspector Ponella was in fact a 30(b)(6) witness testifying on behalf of the City. The motion for sanctions is **denied.**

The plaintiff initially sought to depose NYPD Transit Chief Fox about NYPD policy. In light of Chief Fox's retirement, then-defense counsel reached out to the plaintiff's counsel asking if the plaintiff would consider deposing "a different high ranking official that worked closely with Fox on the relevant policies and crime figures for the time frame that is relevant to the complaint." ECF No. 105-4. Plaintiff's counsel consented to this request, on the condition that the new witness could "testify authoritatively" about the same policy as Chief Fox. <u>Id.</u>

Inspector Ponella was produced for a deposition on November 22, 2019, apparently pursuant to this agreement. As a "courtesy," defense counsel produced Inspector Ponella without requiring a subpoena or a notice of deposition. See Ponella Depo., at 112. The defendants were not served with a Rule 30(b)(6) deposition notice prior to Inspector Ponella's deposition. Indeed, the only 30(b)(6) notice served on the defendants in this case was served on December 10, 2019, weeks after Inspector Ponella's deposition. See Depoian Decl., ECF No. 94 ¶ 5.

The plaintiff argues that Inspector Ponella nonetheless testified as a 30(b)(6) witness. The plaintiff attempts to downplay the fact that there was no 30(b)(6) notice prior to Inspector Ponella's deposition by arguing that plaintiff's counsel's description of the anticipated deposition topics was "consistent with" the inclusion of an unnamed 30(b)(6) witness as a "person[] with pertinent information" in the plaintiff's Rule 26 disclosure. See ECF No. 105-3. The plaintiff also argues that, at Inspector Ponella's deposition, "colloquy between counsel confirms all sides understood that Ponella was produced at minimum as a policy witness." ECF No. 104, at 4. The plaintiff also argues that the defendants waived 30(b)(6) notice with respect to Inspector Ponella because they did not object to

the lack of a 30(b)(6) notice until nearly two years after
Inspector Ponella's deposition.

These arguments are unpersuasive. First, the fact that the
defendants had notice that the plaintiff intended to depose a
30(b)(6) witness does not transform every witness with personal
knowledge of NYPD policy into a 30(b)(6) witness. A 30(b)(6)
witness speaks for an organization and has the obligation to
find out facts (of which the witness may not have personal
knowledge) so that the witness can speak for the entity. See
Fed. R. Civ. P. 30(b)(6). However, witnesses who are not deposed
pursuant to Rule 30(b)(6) can of course testify regarding
policies about which they have personal knowledge. The plaintiff
is therefore wrong to argue that Inspector Ponella must have
been a Rule 30(b)(6) witness because "his only relevance as a
witness could be to testify about the policies underlying
plaintiff's Monell claim." ECF No. 104, at 12. The plaintiff is
also wrong to suggest that all parties understood that Inspector
Ponella was testifying as a 30(b)(6) witness because he was
discussing NYPD policy. To the contrary, at Inspector Ponella's
deposition, then-defense counsel objected to the scope of
questioning that appeared to be appropriate for a 30(b)(6)
witness rather than "just a fact witness." Ponella Depo., at
112.

The plaintiff's argument that the defendants waived formal 30(b)(6) notice with respect to Inspector Ponella also fails. The defendants did not waive 30(b)(6) notice by producing Inspector Ponella without a subpoena or notice of deposition. If the plaintiff wanted to conduct a deposition pursuant to Rule 30(b)(6), he should have sent the defendants a formal 30(b)(6) notice, as he ultimately did in this case. Depoian Decl. ¶ 5.

For avoidance of doubt, the Court concludes that Inspector Ponella did not testify as a 30(b)(6) witness.[19] In any event, the parties' dispute does not appear to have any significance. Defense counsel insists that Inspector Ponella's testimony "is not binding on the City" because Inspector Ponella did not testify as a 30(b)(6) witness. ECF No. 93, at 9. But facts about which Inspector Ponella has personal knowledge, including facts relating to NYPD policy, could still form the basis for liability against the City. And the plaintiff fails to point to any instance in which Inspector Ponella's status as a fact witness as opposed to a 30(b)(6) witness makes any difference.

The plaintiff moves for sanctions under Rule 11(b)(3), which provides that, "[b]y presenting to the court a pleading,

---

[19] The plaintiff also highlights the fact that defense counsel incorrectly referred to Inspector Ponella as a 30(b)(6) witness in a letter to the Court seeking an extension of discovery. See ECF Nos. 105-15, 105-18. Defense counsel admits that this reference was an error, and the Court agrees with the defendants that this after-the-fact misstatement does not transform Inspector Ponella into a 30(b)(6) witness.

written motion, or other paper . . . an attorney . . . certifies
that to the best of the person's knowledge, information, and
belief, formed after an inquiry reasonable under the
circumstances . . . the factual contentions have evidentiary
support or, if specifically so identified, will likely have
evidentiary support after a reasonable opportunity for further
investigation or discovery." Liability under this rule requires
"a showing of objective unreasonableness on the part of the
attorney or client signing the papers." ATSI Commc'ns., Inc. v.
Shaar Fund, Ltd., 579 F.3d 143, 150 (2d Cir. 2009). There was no
objective unreasonableness on the part of defense counsel in
this case.[20]

## IV.

Finally, the defendants bring a motion to exclude the
affidavit of the plaintiff's expert, Dr. Franklin. Because the
Court did not need to consider Dr. Franklin's affidavit in
ruling on the defendants' motion for summary judgment, the
defendants' motion to exclude is **denied without prejudice**. The
defendants may assert specific objections with respect to Dr.
Franklin's anticipated testimony in advance of trial.

---

[20] The plaintiff's attempt to invoke equitable estoppel, which is only
available against the Government "in the most serious of circumstances" and
"upon a showing of affirmative misconduct," Rojas-Reyes v. I.N.S., 235 F.3d
115, 126 (2d Cir. 2000), also fails because there was no affirmative
misconduct on the part of defense counsel.

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the reasons explained above, the defendants' motion for summary judgment is **granted in part and denied in part**. Summary judgment is **granted** with respect to the following claims: § 1983 conspiracy, <u>Monell</u>, and failure to intervene with respect to Officer Trotter. Summary judgment is **denied** with respect to the following claims: false arrest, malicious prosecution, fabrication of evidence, and failure to intervene with respect to Officer Danoy. The plaintiff's motion for sanctions is **denied**. The defendants' <u>Daubert</u> motion is **denied without prejudice**.

The Clerk is directed to close ECF Nos. 72, 81, 96, and 103.

**SO ORDERED.**

Dated:    New York, New York
          August 4, 2022

                              _____
                                    John G. Koeltl
                              United States District Judge